146205 Andrew Neil Davis v. Wayne Carpenter. Oral argument not to exceed 15 minutes per side. Mr. Brandon for the petitioner appellant. You may proceed. My name is Andrew Brandon. I'm here today with Mr. Chris Minton. Together we represent Andrew Neil Davis. I've already requested three minutes for rebuttal. Your honors, this case perfectly exemplifies how an innocent person could be found guilty and sentenced to life in prison in this case. On the one hand, you have a zealous prosecutor who presents debatable medical evidence as if it were fact, as if it were indisputable fact. On the other hand, you have trial counsel who simply fails to dispute that despite the fact that he knows that he needs expert testimony in this case. Then you compound those errors with a post-conviction review process that is supposed to give a hard look to cases like this, but instead imposes a standard that is much higher than Strickland's reasonable probability of a different result standard. This is a sort of habeas corpus, perfect storm, and it is exactly the sort of case in which this court is empowered to grant relief. Now I assume that my job here today is to demonstrate to this court that the Tennessee Court of Criminal And with all due respect to that body, I think that that job is unusually clear in this case. We have exhaustively and perhaps exhaustingly briefed all of the things that we think are wrong with it, but I'm going to highlight today three points, the three key points that are unreasonable about that opinion. The first is, as I mentioned, applying a standard that required Mr. Davis to prove his innocence rather than show simply that there's a reasonable probability of a different result. The second is that the trial court, or excuse me, the post-conviction courts failed to analyze trial counsel's performance through the lens of how important the testimony was. And the third is that, as the Supreme Court said in Porter v. McCollum, the post-conviction court either did not consider or unreasonably discounted key evidence. So turning to the first, and we think this is sort of the most obvious of the problems, is saying that essentially concluding that expert testimony would not have helped Mr. Davis, because his expert could only testify that this injury could have been accidental, not that it was accidental. This runs contrary to all of the evidence, but also to Strickland's standard that simply requires that there be a reasonable probability of a different result. Here, all parties, all parties agreed that expert testimony was essentially the dispositive issue in this case. Trial counsel said to go to trial without a qualified expert would deny the defendant his right to a fair trial and deny him the effective assistance of counsel. Well, you're speaking to the prejudice prong right now, Strickland, right? That's correct, though I would encourage the Court to view this error as sort of infecting the rest of the analysis, the deficient performance analysis. Well, how so? Well, Strickland, in the deficient performance analysis, and this is sort of the second point, is Strickland requires courts to consider all of the circumstances surrounding the representation. And one of those circumstances is how important is the evidence? You know, Yarbrough acknowledged it was very important. He obviously had seen what happened. He got a hung jury the first time with this doctor that wouldn't testify the second time. The question is, I mean, he obviously made efforts to try to find, he wanted to use the same expert. That expert refused. Then he tried to get another expert. He clearly tried. The question ultimately boils down to did he try hard enough? Was it enough? Why was it not hard enough? And that goes to Judge Kethledge's question, which is, or the issue, the sort of intersection of those, of prejudice and deficient performance, which is that part of the circumstances of the representation that Strickland requires courts to look at is how important is the evidence? Right, but let's say, hypothetically, let's say he tries hard to find an expert who will offer a certain opinion but fails. Is he constitutionally ineffective because he failed? Is it like a strict liability, so to speak, standard that Strickland would apply to the lawyer? Your Honor, I don't believe that Strickland would apply a strict liability question, but it would say, what, if you have something that everyone agrees is the most important, then you are at your highest obligation. And that's when the TCCA should have done the analysis of is speaking to one or two people who may or may not have been experts, they may have been just lawyers, is that enough? Well, that isn't all he did. He spoke to, what was it, Dr. Harber, was that the name of the first expert? Dr. Harlen. Harlen, excuse me. He went to Dan Warlick, Harlen's own, to ask him to help because, what, Warlick had some experience in medical training and knew doctors, so he was also on the hunt for an expert. I mean, it wasn't just that Harber only contacted one or two people. That's true, Your Honor, but Dr. Harlen is clearly not a, I mean, he's not someone who can testify. He's not an expert. He has already refused to testify at that point, nor should he. Even as a very challenged on cross-examination expert, he still raised enough doubt, apparently, for the first jury to not be able to agree. That's correct, which, again, just highlights the importance of having an expert there. Right. I mean, I don't think that Harber or nobody disputes that it was extremely important, but the question is, did he not try, do you have a good case that says, say, someone who did the level of search that Yarbrough did is constitutionally insufficient? I think that Hinton v. Alabama is an excellent case for that, out of the Supreme Court, in which they say, you know, it's fine to put on an expert, but you need to get it right. I mean, in that case, the... Does Hinton, I don't remember whether Hinton struggles with the issue we're talking about here today, which is the unavailability, how hard one must try, how hard. Well, it deals with the issue of, was there, trial counsel labored under the mistaken assumption that he couldn't get a, he couldn't afford a better expert, and here... Yeah, well, that's quite different, isn't it, counsel? Well, except the trial counsel here, and this is one fact that the TCCA ignored entirely, labored under an erroneous assumption that he could only look in states contiguous to Tennessee, and that's why the only two people he spoke to were in Mississippi. But I thought that he himself testified that, yes, they had that, I guess, misunderstanding at the outset of their search for another expert, but that they realized that that was not a limitation, and in fact, he talked to somebody in Illinois eventually, so... And that's a finding of, I mean, as I understand the record here, the TCCA or the Tennessee courts made a finding of fact that that misperception fell away at some point in this process. Is that a correct reading of the record here, and if so, how do you deal with that? I do not believe that the Tennessee courts made any reference to that mistake of law. They did make one reference to, he spoke to two medical experts in other states. They say, most likely Mississippi and Illinois. I don't think that that is factually supported by the record, but they do conclude that, but... Well, Yarborough himself says that, you know, we realized we could go broader, so, I mean, this seems like a very tough ground for you to get habeas relief. I mean, you have testimony in the record. Arguably, the court, the state court accepts it. I mean, there's not a whole lot we can do about that determination. Well, it's correct that this court shouldn't rest solely on the contiguous states issue, but this is part of the broader problem. I'm seeing that as, like, out altogether, frankly. I just don't see how it gets anywhere with the scope of the review that the Supreme Court has told us more times than I can count that we have here. Well, just very briefly on that, there's no doubt that they labored under that assumption for some period of time, and the one or two people that Mr. Yarborough spoke to, he said were in Mississippi, and then he said there may have been somebody in Illinois, but we may have just talked about that. But more importantly, with respect to all of this evidence, my third point, the evidence that the courts had disregarded, is Dr. O'Pavin's testimony. You have a medical expert, an internationally known and renowned medical expert, who testifies that she was available, that other people that she personally knows, that she's of a school of thought that have reviewed these sort of rush-to-judgment cases, that many others were available who would have testified similarly. She then testifies that you can't make a decision, whether or not to testify in a case like this, without looking at the file in this case. And this is another thing that the Tennessee Court of Criminal Appeals ignored entirely. Trial counsel failed to show anyone the file. He simply failed to show any expert what was actually in the file. They refused to... But Yorbaro basically says that Warlick verbally summarized the case for the experts whom he contacted. If it's a fair summary, what's the constitutional violation there? Well, Your Honor, Dr. O'Pavin specifically testifies that that's not... She's not the arbiter of what the Constitution says. I mean, she'd be... If this was a direct appeal, direct review, that's... I don't know, maybe that counts for something. But she... Just because she says, I'm out here and nobody hired me and I know others that would have... I don't know what the foundation for her testimony is that other people would testify the same way, because that's the issue. It's not just are there other experts. Would they actually say that this child's death could have been caused by this fall that the defendant said it was caused by? But we do have an example of another expert who offered testimony of the same sort in the first trial, and we know how effective that was. But getting to your question, the constitutional issue here is, as the Supreme Court has recognized, when the state courts ignore that entirely, they ignore all of her evidence. And again, this is where... But see, I would... Tell me if... I'm really trying to work with you on this. It doesn't really matter if their particular reasoning is off. I mean, they give a merits opinion. And now the ultimate question before us is whether any fair-minded jurist could reach the same result. If they make mistakes about particular points in their reasoning, the kinds of things that you're pointing out, that itself doesn't mean no fair-minded jurist could reach the same merits result. And so that is the question we have to ask, not whether... Not sort of grading their intermediate reasoning. Is that a fair description of our job here? I disagree. I think that this court is required to see whether or not they are essentially failing at going through the appropriate Strickland analysis. And especially... Right. But if they get to the right result... I mean, I had this case, Gagne, remember that? An en banc case. And I thought the state court reasoning was borderline preposterous in that case. And I tried to explain why. And that opinion was a dissent. I mean, there was an outcome, and it just became whether any fair-minded jurist could agree with that outcome, I thought. And in that dissent, you said that the Strickland standard is high, or the 2254 standard is high, but is not impossible. I agree. It's true, Your Honor. And I'm not saying it is, but the question is whether a fair-minded jurist could agree with the outcome, is what I thought the question is. Not whether they should have given more consideration to one factor or another. It just shakes out to fair-minded jurist outcome, yes or no. And I see my time's up. I'll briefly respond. I believe that cases like Porter v. McCollum indicate that it is not something that fair-minded jurists can agree on when you simply disregard key evidence like Dr. Obama. Okay. No, that's fair. That is a simply disregarded idea. Thank you. Thank you. Good morning. May it please the Court. My name is Jennifer Smith with the Tennessee Attorney General's Office, representing the warden in this case. Your Honors, I think that the issue, and I think the Court stated it clearly, but the decision to go forward at the second trial without an expert when no expert could be found was a reasonable tactical decision, and we think that it was. Well, it kind of begs the question. I mean, the whole question here is whether the lawyer did enough to find one, so . . . Exactly. Exactly. And as Mr. Brandon pointed out, Mr. Yarbrough certainly recognized the need for an expert, the importance of an expert, and how valuable, in his mind, an expert would be, although I would point out that he testified on post-conviction that after the first trial, which resulted in a hung jury, Mr. Yarbrough went back and was polling jurors about the basis for their decision, and at least one of those jurors had indicated that they were unimpressed with Dr. Harlan's testimony. He had been very severely discredited during his testimony and had actually invoked . . . But at least one apparently was impressed enough or impressed by something. Impressed by something. Whether he or she was impressed by Dr. Harlan is unclear. I just point that out because it is a point that counsel . . . I think, again, it goes to counsel's diligence in the case to go back after that first trial and say, what did we do in that first case? What can we do in the second trial? And he clearly recognized that it was important to have expert testimony. And so then it obviously took steps from the record to secure an expert. Dr. Harlan had refused to testify because of unrelated circumstances, and Petitioner paints that as somehow being a conflict of interest. We disagree with that. Those were circumstances unrelated to the Petitioner's case. Those were personal to Dr. Harlan, personal and professional to Dr. Harlan, and it had nothing to do with this case. Dr. Harlan participated in the first trial as a member of the defense team through his testimony, and we submit continued to participate with the defense in the second trial, albeit behind the scenes and trying to help him, the defense, secure an expert, a replacement expert. I mean, here we know in the post-conviction proceeding, we got this Dr. Opphoven who says, hey, she would have said that it's possible it could have been an accident being dropped and she says there are many forensic pathologists that would have testified on behalf of Davis if they had been asked. Well, if Davis's attorney, if Yarbrough could have easily found another doctor like Opphoven, then why isn't that ineffective assistance of counsel? I think if Mr. Yarbrough could have found an expert to testify, then certainly he would have presented that testimony, but the question is not what Dr. Opphoven testifies to after the fact. The question is what were the circumstances facing Mr. Yarbrough at that time? What was he faced with at the time? And what he was faced with was, number one, an expert who refused to testify and whom the post-conviction court determined, in fact, may have been disqualified because his medical license had been revoked in the interim between the first trial and the second trial. And number two, the state court found and credited the trial counsel's testimony that he was unable to locate a local doctor who wanted to get involved in the case at all. And so, obviously, there were efforts to find an expert in the local community within Tennessee. He elicited the aid of an attorney who, through his experience, his education, and his contacts, may be able to find someone either in the state or preferably out of the state. And efforts were made in that way. At least two experts were identified by that defense team, and I call it a team because I think they were acting as a team. Dr. Harlan was involved in this. There was testimony that Dr. Harlan was involved in some of these conversations with potential experts. There was testimony that Mr. Warlick, who had attended medical school and had over 20 years of experience in medical cases, had attempted to encourage and persuade experts to testify, and that Mr. Yarbrough, as well, was involved in those efforts. There was some question about exactly who Mr. Yarbrough talked to, and I do want to point out, just as an aside, because Mr. Brandon brought it up in his brief, and I think on reflection and looking at the transcript, I think there's a comment in my brief where I said Mr. Yarbrough personally spoke to two experts outside of the state. I may have misread the record. He said it was one or two. He said it was specifically at least one, but there were two experts that were identified, and there was . . . Well, Mr. Brandon makes the point in his brief that we don't even know if they were experts, which . . . Well, I think that is not borne out by the record. I think the record reflects . . . What page of the record would refute that argument that it's unclear as to whether Yarbrough spoke to an expert or . . . Or a lawyer? Okay. Okay. On page 42 of the transcript, of the post-conviction transcript, Mr. Yarbrough was questioned. I think you did . . . We did talk to a lawyer in Mississippi to see if that lawyer knew of any doctors we might use. Question, so is that the person in Mississippi, or was there one also in . . . Was there an expert? And he said, no, I think there was also a doctor, presumably in Mississippi, and then before that he had talked about a doctor in Mississippi and an expert in Illinois, an Illinois doctor. He specifically referred to it as an Illinois doctor. So that's also on page 40, 42, 41 through 42. The state trial court also made a factual finding that the defense counsel had made contact with two medical experts in other states. It was a specific factual finding, but they declined to participate, and that is on page ID number 26. So is it the warden's position that Dr. Oppoven was not fully creditable in saying, oh, she could have easily been found? She says, hey, I could have easily been found, or others . . . She said she was available. Right. She said she, presumably she would have testified, but what she would have done, we think, is not the question. The question is, what did Mr. Yarbrough do, and were his efforts sufficient, and was his decision to stop . . . But ultimately, perhaps, could she have easily been found? I mean, Yarbrough, I gather, would implicitly say no, she couldn't easily . . . There wasn't any billboard on Interstate 40 that said, here I am, Dr. Oppoven, will any baby drop cases come to me? I think her testimony goes more directly to the prejudice prong. I think because she was not involved in the investigation and was not known to Mr. Yarbrough, I think what she may or may not have done, had she been approached, is outside of the performance question. The performance question has to be addressed based on, what did Mr. Yarbrough do? What steps did he take under the circumstances as he knew them to be? And what he knew is that the expert wasn't available. He took steps locally. It was unsuccessful. He went outside the state. It was unsuccessful. At a certain point, counsel made the decision to stop and to change tactics and to go forward without the expert. And actually testified that once that decision was made, he then started to prepare for that cross-examination. He had already tried the case reasonably successfully once, was very familiar with it, but that he took information from both Mr. Warlick and Dr. Harlan in order to prepare for that cross-examination. So that was a tactical shift was made at a certain point, and it's our position that given what he had done to that point and the results that he had gotten, which was refusals to get involved, refusals to support the theory, that it was reasonable at that point for him to stop, to change gears. Do you have any case you can cite us that supports your position that that's enough? Well, I... Comparable case on the facts like this? I was actually unable to find a case that I looked that talked about not being able to secure an expert despite repeated attempts. However, I think what we do know from Strickland is, number one, that a tactical decision by trial counsel made that is informed and made after reasonable efforts is almost unchallengeable on habeas and under the Strickland standards. Strickland doesn't require perfect representation, doesn't require a perfect trial. Everyone agrees that an expert that would support the theory that the defendant had put forth as to how this accident, how this death occurred, that would have been preferable. Everyone agrees to that. But even Dr. Oppenhaven didn't directly support that, and that was another... Well, let me ask you a question about her. She testifies that I was available. I think plenty of other doctors in my field would have so testified. What again, or just remind me, what does the Tennessee Court of Criminal Appeals do with that testimony? Or as Mr. Brandon suggested, they just disregard it. The Tennessee Court of Criminal Appeals addressed that testimony with respect to the prejudice prong. The Court of Criminal Appeals credited the factual findings with regard to Mr. Yarbrough's performance and efforts and tactical decisions separately and looked at Dr. Oppenhaven in terms of the prejudice prong and determined that even assuming there was some deficiency on the part of Mr. Yarbrough, Dr. Oppenhaven's testimony would not have made a difference. Would not have made a difference. It was speculative. Okay, but part of her testimony doesn't go just to prejudice. Part of her testimony is, he could have found me, he could have found a lot of people like me. That seems to go to performance. They just not address that? They did not address that testimony in the performance prong because they correctly looked at Mr. Yarbrough's performance from his perspective. And that's what we think that is the appropriate view when you're looking at counsel's performance. What did counsel know at the time? How did counsel react to it? And were those actions and decisions made in an informed manner based on what counsel did? Now, if counsel just sat back and said, well, Dr. Harlan's not going to testify, so I guess we just got to go forward without an expert, that would be different because obviously if everyone understood there needed to be an expert, it would be unreasonable just to sit back and say we're not going to go forward because this expert has said we can't do it. But counsel did more than that and that's what the state court did, that's what the reacted in response to a situation that was unfortunate but was a reality and trial counsel deal with these realities every day and they make these adjustments every day. Everyone wants to have the perfect witness at trial. That perfect witness is not always available. And in this case, despite diligent efforts, counsel was not able to locate a witness. That's the key, was it diligent efforts? If it was diligent efforts, you're probably home free. If it wasn't diligent efforts, then you're in trouble. Well, perhaps. If it wasn't diligent, then we get to whether or not Dr. Oppaven's testimony actually would have had an impact. Well, the Tennessee Court of Appeals is almost clearly wrong in its analysis. She didn't have to say that A, it was an accident. All she has to do is raise doubts that it could have been an accident. In other words, the state couldn't prove beyond a reasonable doubt that it was intentional dropping. Well, we think in order for her testimony to have any impact whatsoever, she has to say something more than, well, it could have been an accident. Well, it could have been a homicide. I don't know how it happened. I disagree with that. It could have happened in any number of ways. I don't know how it happened. I don't understand that. That was a non, she offered it respectfully, a non-opinion. That's enough. All she has to do is raise a reasonable doubt. You've got the burden to prove beyond a reasonable doubt that it was a murder. If she says, could have been a murder, but it could have been an accident, that raises a reasonable doubt. Actually, she didn't really, she did not opine as to anything. She said she does not know how it happened. All right. That's all she said. That's enough, I think. Well, it wouldn't necessarily be enough to overcome, and that's the question. How balanced, I'm not saying that it would have had no impact whatsoever. The question is whether there's a reasonable probability it would have resulted in a different outcome. When you look at the strength of the state's case as a whole, the two physicians who testified, the defendants shifting accounts of how the accident happened, the court was absolutely correct that that testimony would not have been sufficient to rise to that level. Not that it wouldn't have. In the absence of the first trial, you might get somewhere with that argument on habeas. There was a lot of evidence, some of the stuff you've just mentioned, but when you have an actual trial where the guy testifies the way Harlan did, and there's a hung jury, then that argument is a little tougher to make. Your Honor, again, and I would just direct the court to Mr. Yarbrough's testimony about Dr. Harlan, to Dr. Harlan's actual testimony in that first trial, and to really the devastating cross-examination. His testimony was really not that helpful in the first trial, and in fact, Mr. Yarbrough thought that it may have even been a little harder. So we don't know why there was a hung jury, indeed, and I think it would not be appropriate to factor speculation about why the jury came back as it did in the assessment of prejudice, but I just offer that respectfully, and see that my time is running out, but if there are no further questions, we would ask that the court affirm the judgment of the District Court. Thank you. Thank you for your argument. Thank you, Your Honors. Just want to mention briefly, I think this is the first time in this litigation that I've heard the suggestion that this was a tactical decision on trial counsel's part, to go to trial without an expert. Disagree profoundly. Any trial counsel plainly said that this was necessary, plainly said that it would I think counsel, I thought I heard her say, change tactics. Realize we're going, and that we're going to cross-exam is going to be our only benefit. That may be the case. I just don't think it's entitled to the deference of a sort of strategic decision. I just want to home in on this question of how do we get to relief in this case under 2254 D. This is just as clean a case, as clean a record of this as I've seen. On the prejudice side, yes. On the performance, not so much. Except, Your Honor, what happens here is we have a, the state court fails in its prejudice analysis. And in doing so, it disregards entirely the testimony of Dr. Alpov, and essentially concludes that- We're talking about prejudice. Let me suggest to you, because time's running short. This case boils down to, as Judge Gilman just suggested, were the efforts enough or not on the performance side? And I have this question for you. I mean, they didn't move heaven and earth here. It appears. I will grant you that. But that is not the question before us. Not direct review, et cetera. We have Supreme Court precedent that says the more general the Supreme Court rule that is at issue in a habeas case, the more latitude the state courts have, right? I mean, that's, you know, part of the habeas jurisprudence. Strickland's a pretty general rule. And we don't seem to have that many data points on how much searching is enough. On that more specific question, we just don't have much. This isn't about, you know, you should have made another argument on appeal or something. Those cases don't tell us much about the nub of this case. Why doesn't that lack a specificity as to, let's call it, you know, diligent search question? Why doesn't that weigh against you on habeas? Your Honor, the reason is that we do have specificity with regard to how to conduct the analysis. And the TCCA doesn't even come close. They fail to look at trial counsel's actions through the lens of how important it is. Because they have already dismissed it as unimportant. They already said this isn't important. They also fail to consider any of the evidence that's relevant to deficient performance other than what trial counsel says he did. And so when you combine that with their failure on the prejudice problem, the failure to look at it through the right lens, they have failed in their analysis entirely. And under 2254D, this court is absolutely empowered to grant relief. Thank you, Your Honor. Thank you. Thank you, counsel. Both did a fine job. We'll consider your case. It's interesting. Look for an opinion.